# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION



FILED
FEB 27 2015
Clerk, U.S. District Court
District Of Montana
Billings

RICHLAND PARTNERS, LLC,
JOHN PAYNE, and ROGER HALL,

        Plaintiffs,

vs.

COWRY ENTERPRISES, LTD.,

        Defendant.

CV 14-14-BLG-SPW

ORDER AND OPINION

## I.    Introduction

Plaintiffs Richland Partners, LLC, John Payne and Roger Hall ("Richland Partners") brought claims for property damage/negligence, strict liability, trespass, and private nuisance based on Defendant Cowry Enterprises, Ltd.'s, ("Cowry") alleged contamination of Richland Partners' property in Eastern Montana. (Doc. 6). Richland Partners also brought claims for negligent mismanagement, constructive fraud and tortious interference for Cowry's alleged interference with Richland Partners' attempts to subdivide the property. (*Id.*) Cowry moves for

summary judgment on all of Richland Partners' claims. (Doc. 16). Having considered the parties' submissions, the balance of the record, and the relevant law, and no party having requested oral argument,[1] the Court GRANTS Cowry's motion for summary judgment.

## II.   Background

In the early 1980s, a company named Aminoil drilled some oil wells in Eastern Montana. (Doc. 12 at 2). While drilling at least one of the wells, Aminoil reclaimed a reserve pit. (Doc. 22 at ¶ 3). A reserve pit is a storage area dug in the ground that acts as a small reserve for storing spare or waste mud, base oil, water or brine while drilling an oil well. (Doc. 12 at 2). It was apparently common for companies to use a reserve pit while drilling a well during the early 1980s. (*Id.*) Typically, at the end of the drilling operations, the reserve pit was drained and

---

[1] Oral argument is not necessary where the non-moving party would suffer no prejudice. *Houston v. Bryan*, 725 F.2d 516, 517–18 (9th Cir.1984). "When a party has had an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice in refusing to grant oral argument." *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir.1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir.1991) (internal punctuation omitted)). "In other words, a district court can decide the issue without oral argument if the parties can submit their papers to the court." *Id.* Here, the issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court. Accordingly, the court will not hold oral argument.

reclaimed by filling the pit and placing soil on top. (*Id.*) In 1981, the parties'
predecessors in interest settled all claims with Aminoil for surface damage,
including for oil contamination, and the subsequent landowner released such
claims. (Doc. 22 at ¶ 5).

In approximately 1984, Phillips Petroleum Company purchased Aminoil and
became owner/operator of the wells. (*Id.* at ¶ 6) In 1988, Conoco purchased
ownership and operation of the wells from Phillips. (*Id.* at ¶ 7) In 1993, Cowry
assumed ownership and operation of the wells from Conoco. (*Id.* at ¶ 8).

In 2012, Roger Hall and John Payne formed Richland Partners, LLC, and
purchased property ("the Property"), which included Aminoil's reserve pit, to
develop an RV and commercial park. (*Id.* at ¶ 2) The Property is adjacent to two
active oil wells owned by Cowry. (Doc. 21 at 2) Richland Partners hired
Territorial Landworks to conduct due diligence before purchasing the Property and
to assist with the subdivision approval process. (Doc. 22 at ¶ 16). At some point
after purchasing the Property, Richland Partners, through Territorial Landworks,
discovered oil waste from Aminoil's reclaimed reserve pit on the Property. (*Id.* at
¶¶ 4-5). The reclaimed reserve pit is adjacent to, but not located on, a location
where Cowry operates an active well. (Doc. 21 at 2) Despite operating the well,

Cowry did not drill any of the wells on the Property and never owned or controlled the area where the oil waste was found. (*Id.*) The parties agree that Cowry's operation did not cause or result in oil seeping on to or contaminating the Property. (Doc. 22 at ¶¶ 4-5).

After Richland Partners purchased the Property, Territorial Landworks instructed a realtor to contact Cowry to inquire about its intent to drill on Cowry's oil pads adjacent to the Property. (*Id.* at ¶ 6). The realtor told Cowry that his potential client was looking at purchasing the land, but did not mention any plans to build a subdivision. (*Id.* at ¶ 43). In response, Cowry corporate officer Dzifa Glymin told the realtor "the [ ] wells were drilled back in the 80's. There are no lease/rental fees paid for the surface land, as the owner receives royalties on production. . [and] as far as new drilling, there is none expected near or around [the wells] anytime soon." (*Id.* at ¶ 18).

Thereafter, Richland Partners submitted an application to Richland County requesting approval of a major industrial and residential subdivision called Richland County RV and Industrial Park ("the Park"). (*Id.* at ¶ 23). At the request of the Richland County Planner Officer, Territorial Landworks, Richland Partners' agent, "made a great deal of effort" to get Cowry to submit comments about the

Park. (*Id.* at ¶ 24). Richland Partners, through Territorial Landworks, also reached out to Cowry seeking Cowry's comments on the Park. (*Id.* at ¶ 64). In response, Cowry President Derick Glymin contacted Territorial Landworks and conveyed that he was "pro-development" and did not oppose the project, but wanted to ensure the project was safe for any children coming near the wells. (*Id.* at ¶ 65). Glymin also submitted comments orally and in writing to the Richland County Planning Board, expressing Cowry's concern about the potential hazard of people, particularly children, living so close to producing oil wells. (*Id.* at ¶¶ 25-26, 46).

Some of Cowry's concern stemmed from the fact that its wells were drilled through rock formations containing sour gas zones, including hydrogen sulfide ("H2S"). (*Id.* at ¶ 61) H2S is a highly toxic gas present in some rock formations. (*Id.* at ¶¶ 48-49) When Cowry purchased the wells, the wells produced from a sour gas zone. (*Id.* at ¶ 49) After purchasing them, Cowry re-worked the wells so that neither well produces from a sour zone, (*id.* at ¶ 50), but one well still produces from a formation with a zone of sour gas. (*Id.* at ¶ 52) There is some risk that an H2s release could occur from either well. (*Id.* at ¶ 54) In fact, Cowry has H2S monitors surrounding the well that produces from the formation with the sour gas. (*Id.* at ¶ 53) Additionally, Cowry anticipates that the wells will most

likely have to be re-drilled at some later date and a higher potential for an H2S release exists when drilling. (*Id.* at ¶¶ 56-57).

As a result of these concerns, Cowry's operations manager Ted Burkle attended a county meeting and expressed concerns about building the Park next to Cowry's active oil wells. (*Id.* at ¶ 60) Cowry also sent a letter to the Richland County Planner opining that numerous mitigation measures for the Park would be required because of the presence of H2S if it were approved, including implementing evacuation plans, minimum fence construction, ongoing maintenance, and additional security measures. (*Id.* at ¶ 61).

As a direct result of the concerns Cowry raised about H2S, (*id.* at ¶ 75), the Richland County Commissioners imposed numerous conditions upon the Park, including a 300 foot clear zone around the wells where no building may occur and no one but H2S certified personnel may enter; and a qualified evacuation plan. (*Id.* at ¶ 72) With regard to oil pad activity, the Richland County Commissioners found "the most potentially significant hazard is the known release of poisonous H2S gas from the well and the potential for future releases." (*Id.* at ¶ 74) Because of these conditions, Richland Partners' ability to develop the property it purchased has been limited and more expensive. (*Id.* at ¶ 78).

## III.   Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Anderson*, 477 U.S. at 256–57. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza*, 545 F.3d 702, 707 (9th Cir.2008).  The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Id.*  The court should not weigh the evidence

and determine the truth of the matter, but determine whether there is a genuine

issue for trial. *Anderson*, 477 U.S. at 249.

## IV.   Discussion[2]

### A.   Nuisance

Cowry argues that summary judgment is appropriate on Richland Partners'

nuisance claim because there is no evidence that oil from Cowry's operations

seeped or contaminated the Property.  Richland Partners argues that while it's true

that Cowry's oil did not contaminate the Property, Aminoil's did, and because

"Cowry is the successive owner of the property at issue and now stands in the

shoes of Aminoil," Cowry is "liable in the same manner as the entity that created

the nuisance."  (Doc. 21 at 9).

Under Montana law, a nuisance is:

Anything which is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. . .

---

[2] Because Richland Partners acquiesced to summary judgment on their claims of property damage/nuisance, negligence, strict liability, negligent misrepresentation, and constructive fraud, (doc. 21 at 8, fn. 1), only their remaining claims of private nuisance, trespass, and tortious interference are analyzed herein.

§ 27-30-101, MCA. A subsequent property owner may be liable for nuisance under § 27-30-105, MCA, which states:

> Every successive owner of property who neglects to abate a continuing nuisance upon or in the use of such property, created by a former owner, is liable therefore in the same manner as the one who first created it.

Even construing the facts in the light most favorable to Richland Partners, their nuisance claim fails. As noted above, Richland Partners agrees that Cowry's oil did not contaminate the Property. (Doc. 21 at ¶¶ 4-5). In light of that admission, Richland Property's nuisance claim only survives if Cowry is liable as a successive owner of the Property. *See* § 27-30-105, MCA (creating liability for "every successive owner of the property[.]"). It is undisputed, however, that Cowry never owned the Property. (*Id.* at ¶ 10). Although Cowry eventually purchased Aminoil's wells, there is no evidence before the Court that Cowry possessed an ownership interest in the Property, the contamination of which is the subject of this action.

Because Cowry never owned the contaminated land, it had no statutory duty to abate the oil pit nuisance on the land, and thus, has no liability under § 27-30-

105 for neglecting to abate the nuisance. Accordingly, Cowry has shown that it is entitled to judgment as a matter of law on Richland Partners' nuisance claim.

**B.    Trespass**

Cowry argues that summary judgment on Richland Partners' trespass claim is appropriate because Richland Partners cannot prove that Cowry intruded on the Property. Richland Partners argues that because the nuisance statute requires Cowry to remove the oil reserve pit from the Property, the presence of the oil pit itself is evidence of trespass, so a question of fact exists for the jury as to whether trespass occurred.

Trespass in Montana is an intrusion on a party's right to exclusive possession of his property. *Burley v. BNSF*, 2012 MT 28, ¶ 13, 364 Mont. 77, 273 P.3d 825 (2012). "One is subject to liability to another for trespass . . . if he intentionally (a) enters land in possession of the other, or causes a thing or third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." *Branstetter v. Beaumont Supper Club*, 224 Mont. 20, 24, 727 P.2 933, 035 (1986) (quoting *Restatement (Second) of Torts* § 158(1965)). The entry of another person or thing obstructs a property owner's exclusive possession. *Id.*

Construing the facts in the light most favorable to Richland Partners, there is no evidence that Cowry entered, or caused anything else to enter, Richland Partners' land. The undisputed material facts show that Cowry never drilled a well on Richland Partners' property, (doc. 22 at ¶ 19), and Cowry never caused oil to migrate to Richland Partners' property. (*Id.* at ¶¶ 3, 5, 12-13). Instead, the parties agree that a prior property owner, Aminoil, caused the oil contamination when it dug a pit while drilling a well in the 80s. (*Id.* at 5). The evidence before the Court is that no Cowry person, thing, or intangible ever entered or remained on the Property, thus liability does not exist under the first two prongs of the *Branstetter* test. Also, in light of the fact that Cowry never owned the Property, this Court rejected Richland Partners' argument that Cowry had any duty to remove the oil contamination from the Property under its nuisance analysis. That reasoning applies here as well. Because Cowry has no duty to remove the oil from the Property, Richland Partners also cannot establish liability for trespass under the last prong of *Branstetter.*

Even assuming Cowry had inherited responsibility for the oil pit from Aminoil, however, Richland Partners' trespass claim fails as a matter of law because Richland Partners cannot prove the intent element of trespass. Under

Montana law, the "intent" requirement for intentional trespass is satisfied if the actor desires to cause the consequences of the act or believes that its consequences are substantially certain to result. *Branstetter*, 224 Mont. at 24, 727 P.2d at 935. If an activity or implement is conducted or built prior to a plaintiff's purchase of his property that subsequently results in a trespass on the plaintiff's property, the defendants cannot be said to have intentionally caused the trespass, and thus cannot be liable for intentional trespass. *Guenther v. Finley*, 236 Mont. 422, 769 P.2d 717 (1989).

Here, it is undisputed that Aminoil dug the oil pit and contaminated the land before Cowry purchased the wells and prior to Richland Partners' purchase of the Property. (Doc. 22 at ¶ 5). Thus, any trespass potentially attributable to Cowry cannot be considered intentional. *Id.* at 425, 769 P.2d at 719. As a result, Richland Partners does not have sufficient evidence to prove the elements necessary to its trespass claim. Cowry is entitled to judgment as a matter of law.

### C.     Tortious Interference

Cowry argues that summary judgment is appropriate on Richland Partners' tortious interference claim because Cowry's statements about the Park were justified and made in good faith and are protected by the Noerr-Pennington

doctrine. Richland Partners argues that Cowry's statements were not justified and are not protected by the Noerr-Pennington doctrine because the statements were made solely to interfere with Richland Partners and cause them damage.

As a threshold matter, this Court must determine which tortious interference analysis applies to Richland Partners' claim. Montana has two tortious interference torts. The first is tortious interference with a contract, where a plaintiff must prove that the defendant's acts:

> 1) were intentional and willful; 2) were calculated to cause damage to the plaintiff in his or her business; 3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and 4) that actual damages and loss resulted.

*Emmerson v. Walker,* 2010 MT 167, ¶ 23, 298 Mont. 213, 994 P.2d 1124, (citing *Hardy v. Vision Serv. Plan,* 2005 MT 232, ¶ 18, 328 Mont. 385, 120 P.2d 402). In order to establish a cause of action, it must be shown that the actor intentionally committed a wrongful act without justification or excuse. *Id.* at ¶ 27. Requisite to the analysis of this tort is the existence of a contract, however. *See Maloney v. Home Investment Center, Inc.,* 2000 MT 34, ¶ 41, 298 Mont. 213, 994 P.2d 1124 ("the key difference between the two tort theories is that unlike interference with contractual relations, intentional interference with either "business relations" or

"prospective economic advantage" does not require that a contract exist between any of the involved parties.)

The elements of tortious interference with contract are the same as those analyzed in the related tort of intentional interference with prospective economic advantage. *Maloney*, ¶ 41. Under this second interference theory, "a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship." *Id.* at ¶ 42. The Montana Supreme Court has explained that intentional interference with prospective economic advantage and tortious interference with a contract have essentially the same four elements, but differ in character:

> The key difference between the two tort theories is that unlike interference with contractual relations, intentional interference with either "business relations" or "prospective economic advantage" does not require that a contract exist between any of the involved parties. **Rather, the focus of the legal inquiry is on the intentional acts of the "malicious interloper" in disrupting a business relationship.**

*Id.* (citing *Morrow v. FBS Ins. Montana-Hoiness Labor, Inc*, (230 Mont. 262, 749 P.2d 1073 (1988) (emphasis added)).

Here, there is no evidence in the record of a contract existing between any of the involved parties so no tortious interference with a contract claim exists. By liberally construing the Complaint, this Court finds that the applicable interference tort at issue is intentional interference with prospective economic advantage, which requires the Court to focus first on the element of malicious action. *Maloney*, ¶ 42.

### 1.    Was there a malicious act or was the action justified?

"[T]ortious interference requires proof of malice in the legal sense-that the defendant acted wrongfully, unlawfully, or without justification or excuse." *Signal Peak Energy, LLC v. E. Montana Minerals, Inc.*, 922 F.Supp.2d 1142, 1150 (D.Mont.2013). According to the Montana Supreme Court, a plaintiff cannot prove malice based on otherwise legal actions of a defendant. *Taylor v. Anaconda Federal Credit Union*, 170 Mont. 51, 550 P.2d 151, 154 (1976) ("malice is not presumed and cannot be inferred from the commission of a lawful act).

In *Taylor*, the Court considered whether liability existed under a tortious interference theory where the defendant mortgaged property in which plaintiff and defendant both had an interest - an act that was expressly legal. *Id.* Because that act was expressly allowed by law, and because no other factual information on the record showed any wrongful or malicious intent, no presumption or possible

conclusion of malice existed, and the Court found summary judgment for

defendant on the issue of tortious interference was appropriate. *Id.* Montana law

provides that an action taken in good faith belief that it is performed with right and

justifiable cause cannot serve as the basis for a tortious interference claim, even if

it turns out, the action is not legally justified. *Grenfell v. Anderson*, 311 Mont.

385, 56 P.3d 326, 336-37 (2002).

Federal Courts in Montana have also recognized that otherwise legal action,

taken for legitimate business reasons, cannot substantiate liability for tortious

interference. *See e.g., Flagstone Development, LLC v. Joyner,* 2011 WL 4526756,

(CV-08-100) (D. Mont. 2011); *Statewide Rent–a–Car, Inc. v. Subaru of America,*

704 F.Supp.183, 186 (D. Mont .1988). In *Flagstone* and in *Statewide*, the court

dismissed the plaintiffs' tortious interference claims because the defendant's

actions were otherwise legal and allowed by law. 2011 WL 4526756, *5, *Subaru

of America*, 704 F. Supp. at 186.

Here, Richland Partners argues that Cowry improperly used the "illusion" of

H2S gas to scare the Richland County Planning Board and Commissioners into

forcing untenable conditions on Richland Partners, when in fact Cowry's

motivation was to avoid financial strain from the Park. (Doc. 21 at 14).

Regardless of Cowry's motives for its comments to the Planning Board, there is nothing illegal about commenting on a potential subdivision to a county planning board. In fact, it is undisputed that Richland Partners asked Cowry to comment to the Planning Board about the Park. (Doc. 22 at ¶ 18). Simply because Richland Partners was not happy with Cowry's comments does not make the comments illegal. Similarly, voicing concern for public safety and opining on measures needed to ensure the public's safety does not demonstrate malicious conduct.

This Court finds that for the same reasons no malice exists, Cowry's conduct was likewise justified. Richland Partners' argument that Cowry complained the Park would cost Cowry significant sums of money is not persuasive to the Court. A company is justified in setting out issues that may affect it when supporting or objecting to a proposed subdivision, including financial concerns. Voicing those concerns, as well as others, is part of the purpose of a Planning Board Meeting. Moreover, as a logical matter, Cowry did not own the property Richland Partners purchased to subdivide. As a result, Cowry derived no benefit from duping Richland Partners into purchasing the property with promises to not drill and holding itself out as "pro-development," as Richland Partners contends.

Additionally, in his letter to the Richland County Planning Board, Derick Glymin explained that the economic burden would result from having to ensure the area is safe for an increased population. (Doc. 20-3 at 20). Richland Partners' argument that the presence of H2S was a mere "scare tactic" is unsupported by the evidence. Glymin produced studies regarding Hydrogen Sulfide Safety with figures and data to provide insight into where potential gas exposure zones could exist, that the Planning Board apparently found reliable. Consequently, this Court finds that Cowry's actions prior to and subsequent to Richland Partners' purchase of the property were justified and done without malice. Summary judgment is appropriate.

### 2. The Noerr-Pennington Doctrine

Notwithstanding the fact that Cowry's actions were without malice, Cowry is also protected from liability for its comments and actions by the Noerr-Pennington doctrine. The United States Supreme Court has described the right to petition as "among the most precious of the liberties safeguarded by the Bill of Rights" and "intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (quoting *United Mine Workers of America, Dist. 12 v.*

*Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967)). The right to petition extends to all departments of the government, including the executive department, the legislature, agencies, and the courts. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972).

Noerr–Pennington immunity is a doctrine initially created "to protect efforts to influence legislative or executive action from liability under the Sherman Act." *Oregon Natural Resources Council v. Mohla,* 944 F.2d 531, 533 (9th Cir.1991). While the Noerr–Pennington doctrine originally arose in the antitrust context, "the [doctrine's] protection has been expanded to apply to petitions to courts and administrative agencies, as well as to preclude claims other than those brought under the antitrust laws." *ONRC v. Mohla,* 944 F.2d at 533–34 (citations omitted). Thus, the Noerr-Pennington doctrine ensures that those who petition the government for redress of grievances remain immune from liability. *Id.*

The Supreme Court has recognized a "sham exception" to the Noerr-Pennington doctrine limiting this liability. When "the alleged [petition] is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," the petitioner does not have Noerr-Pennington immunity and is thus not protected from liability. *Franchise*

*Realty Interstate Corp. v. San Francisco Local Joint Executive Board,* 542 F.2d

1076 (9th Cir.1976)). In a "sham" situation, a defendant's activities are not

genuinely aimed at procuring favorable governmental action. *Oregon Natural City*

*of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380 (1991). In

other words, "liability exists where someone uses the governmental *process*—as

opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.*

(emphasis in original).

Richland Partners relies on the "sham exception" to the Noerr-Pennington

doctrine and argues that because Cowry took action to interfere with Richland

Partners' business, the doctrine does not protect Cowry from liability. (Doc. 21 at

16). Richland Partners' reliance on the "sham exception" is misplaced. The

undisputed evidence before the Court is that, through its comments, Cowry was

seeking official action from the Planning Board. *See Franchise Realty,* 542 F.2d at

1081 (the sham exception is "limited to situations where the defendant is **not**

seeking official action ... so that the activities complained of are 'nothing more'

than an attempt to interfere with the business relationships of a competitor.")

(Emphasis added). Although Cowry indisputably set out to disrupt Richland

Partners' subdivision approval process, it sought to do so not through the very

process of commenting to the Planning Board, but rather through the results of its comments, which were the mitigation requirements imposed on Richland Partners by the Planning Board.

For example, Cowry's comment to the Planning Board about the potential exposure to H2s gas was not made simply to impose cost and delay on Richland Partners by having to respond to the specific comment. Instead, by way of such comments, Cowry requested the Board take specific action by either rejecting the subdivision altogether or requiring that Richland Partners take specific steps to mitigate safety and health concerns caused by locating a subdivision next to an active oil well that produces from a formation containing sour gas. (Doc. 20-3 at 20). It is undisputed that the Richland County Commissioners imposed specific conditions upon the Park, including a 300 foot clear zone around the wells where no building may occur and no one but H2S certified personnel may enter and a qualified evacuation plan, as a direct result of Cowry's comments regarding H2S gas. (Doc. 22 at ¶ 75).

Cowry's other comments regarding the need for a fence to keep children off of the wells and the need for masks and oxygen for local residents can be construed the same way. Based on Cowry's specific requests for action, this Court finds that

Cowry was genuinely seeking governmental action and is thus entitled to immunity under the Noerr-Pennington doctrine. As a result, Cowry has shown that it is entitled to judgment as a matter of law.

## V.    Conclusion

For the above stated reasons, IT IS ORDERED that Cowry's motion for summary judgment on all claims (Doc. 16) is GRANTED. Judgment shall be entered in favor of Cowry. All deadlines are VACATED, and this case is CLOSED.

DATED this ___27th___ day of February 2015.

_Susan P. Watters_
SUSAN P. WATTERS
U.S. DISTRICT COURT JUDGE